# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MELVIN STRICKLAND,

        Plaintiff,

        -vs-                        Case No. 13-CV-1127

LT. VAN LANEN, CO MEJIA,
CO ELLERS, CO SCHULTZ,
SGT. STEVENS, and JOHN AND JANE DOES,

        Defendants.

# DECISION AND ORDER

The plaintiff, Melvin Strickland ("Strickland"), who is a Wisconsin state prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*. The plaintiff alleges that the defendants subjected him to an unconstitutional strip search at Green Bay Correctional Institution on July 17, 2013. The defendants have filed a motion for summary judgment. For the reasons set forth herein, the Court will grant the motion.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A.,*

*Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTS[1]

Strickland was confined at the Green Bay Correctional Institution ("GBCI") all times material to this action. GBCI is a maximum security institution located at Green Bay, Wisconsin. The defendants, who are all employed at GBCI, are Lieutenant Jay A. VanLanen, Correctional Officer Alejandra Mejia, Correctional Officer Ashlianne Ehlers,

---

[1] Facts are taken from the Defendants' Proposed Findings of Fact, which are undisputed.

Correctional Officer Kelly Schultz, and Correctional Sergeant Darci Stevens.

**Strip Searches**

Pursuant to Wis. Admin. Code DOC 306.17(2), a "strip search," means a search in which the person is required to remove all clothes, and includes examination of the inmate's clothing and body as well as visual inspection of body cavities. Staff conduct a strip search in a clean and private place. Any staff member may conduct a visual inspection of body cavities. A strip search is conducted by two staff, one of which must be of the same sex as the inmate unless an emergency situation exists.

Inmate searches are critical to the security of an institution. They are a means to identify and confiscate contraband possessed by inmates, prevent contraband from being moved from one location to another, prevent the introduction of contraband from outside the institution, and to identify any evidence of an assault, self-inflicted injury, or disfigurement on the part of inmates.

Contraband can be any item, including: 1) any item which inmates may not possess under the Wis. Admin. Code §§ DOC 303.42-303.47, such as money, intoxicants, drug paraphernalia, and weapons; 2) any item which is not state property and is on the institution grounds, but not in the possession of any person; 3) any item which is in the possession of an inmate, if knowing possession of it would violate the Wis. Admin. Code § DOC 303.47; 4) any item which an inmate may possess but which comes into his or her possession through unauthorized channels or which is not on the inmate's property list and

3

is required to be; and 5) stolen property. Contraband is a direct threat to the safety of staff, inmates, and the institution as a whole. Weapons can be used to threaten, injure, or kill staff or inmates and they may be an inducement to cause a disturbance which threatens everyone in the institution. Similarly, drugs can be used by inmates for self-harm or to induce or coerce other inmates. Furthermore, drugs can alter the behavior of inmates creating a safety risk for staff. Inmates often hide contraband, including drugs and weapons, on their bodies in areas that are not visible over their clothing and/or can be missed with a routine pat-down search. There have been occasions of inmates hiding drugs inside their anal cavity and groin, inside socks, shoes, and underwear, and inside holes in their clothing, all of which would be detectable only through a strip search.

Staff may conduct strip searches under the following circumstances: 1) before an inmate enters or leaves the security enclosures of a maximum or medium security institution or the grounds of a minimum-security institution; 2) before an inmate enters or leaves a segregation unit or changes status within a segregation unit; 3) before or after visits, or during a visit; 4) as part of a periodic search and lockdown of all or part of the institution's premises; and 5) at the direction of a supervisor. Before a search is conducted, staff inform the inmate that a search is about to occur, the nature of the search, and the place where the search is to occur.

A proper strip search is performed as follows: the correctional staff directs the inmate to remove all clothing and hand it over to the searching staff member. Once received,

4

the staff member will place the clothing in a clean and secure area, away from inmate contact. Once the inmate is completely unclothed, the staff member will visually inspect the entire body, including hair, ears, mouth, nose, hands, armpits, groin area, between the toes, bottoms of feet, inner portions of the legs, and rectum. It may be necessary for an uncircumcised male to roll back the foreskin of his penis for inspection. All clothing and personal articles are inspected and then returned to the inmate. The entire strip search process takes approximately two minutes. Of that time, an inmate is without his underwear for about a minute. This is because the inmate's underwear is the last thing handed over to the officers during a strip search and the first thing handed back.

While conducting a strip search, correctional staff explains to the inmate in a casual tone what they are doing during the search. Staff strives to preserve the dignity of inmates in all searches conducted.

**July 17, 2013 Search of the Segregation Unit**

The July 17, 2013 unit-wide search of the GBCI Segregation Building was a planned search. The search was ordered by the Warden and planned by Security Director Pete Ericksen. It included conducting a search of: 1) all segregation inmates and their cells, and 2) all common areas to the Segregation Building. The point of the search was to reduce the amount of contraband on the unit. A unit-wide search is typically conducted every few years, or sooner if a need arises. One of the motivating factors behind the unit wide search of segregation on July 17, 2013, was to reduce the amount of contraband prescription drugs in

5

the unit and thereby reduce the amount of attempted drug overdoses.

Prior to July 17, 2013, the segregation unit had experienced numerous incidents of inmates misusing prescription medication. Many inmates in segregation are prescribed medication. Problems with prescription medications occur when an inmate hoards medication. This occurs when an inmate "mouths" or "cheeks" the medication, spits it out, or drops the medication by the cell door without the correctional officer seeing him do it. When inmates hoard medication, they can "fish" the medication out of their cells to other inmates or build up a supply of the medication. Prior to July 17, 2013, the segregation unit had several incidents where inmates ingested what appeared to be large amounts of prescription medication in front of staff. When inmates do this, they typically have to be taken to a local hospital for evaluation and treatment. These incidents pose a serious risk to the safety of the inmate and staff and cause a major disruption to the operation of the institution.

The Segregation Captain knew of the unit-wide search approximately two to three weeks before it was conducted. Line correctional staff members did not know about the search until they arrived at work on July 17, 2013. Additional correctional staff members were assigned to the segregation unit on July 17, 2013, to help facilitate the search. Segregation was staffed with approximately three times the amount of staff as a normal day. The plan for conducting the unit wide search was to remove inmates from their cells, take them to be strip searched, place them in a holding area while their normal cell was searched,

and then return them to their original cell. As part of this unit-wide search, staff also searched the cells for needed repairs.

During the unit-wide search, the Segregation Building was on lockdown, meaning that all operations were suspended, including health services appointments and other programs. Staff was assigned to one of four strike teams, with each strike team being assigned a specific task for the duration of their shift. The teams were assigned to: 1) escort inmates, 2) conduct strip searches, 3) conduct cell searches, and 4) respond to any incidents where inmates refused staff directives to comply with the search. No female officers were assigned to conduct strip searches. To the knowledge of Lieutenant William Swiekatowski, one of the supervisors of the search, no female officer took part in a strip search on July 17, 2013.

There is one strip cell in the segregation unit that is used to conduct strip searches during normal operations. The strip cell is equipped with a full body glass window that allows staff to view the inmate's entire body during the search. It is necessary to view the inmate's entire body to make sure the inmate does not drop contraband into areas that could not be seen with a smaller window. The strip searches on July 17, 2013, were originally planned to take place in the strip cell and the four observation cells on the segregation unit. The four observation cells are equipped with two sliding doors: one door to the hallway that enters a 3' x 6' space, and a second door to the cell itself. The vestibule is the 3' x 6' area between the hallway door and the cell door. The observation cell doors

7

are also equipped with full body windows on both doors that allow staff to look in and fully see both the vestibule area and the cell itself. The observation cells are normally used to house inmates who need to be closely monitored because they pose a short term risk to themselves or staff. Because the vestibule doors have large windows that provide a full body view, they are an ideal location to conduct strip searches in segregation. However, the observation cells were occupied with inmates on July 17, 2013. This was problematic because the inmates in those cells would be able to observe any strip search conducted in the vestibule area due to the large window on the cell door. As a result, the Segregation Captain determined that the observation cells could not be used for strip searches.

On July 17, 2013, there were 141 inmates in segregation. It was not feasible to conduct all 141 strip searches in the one strip cell and complete the unit-wide search in the time approved for the unit lockdown. Therefore, an alternative location had to be selected. Strip searching inmates in their own cell was not a viable alternative because the window that looks into normal segregation cells is 19" x 5", which does not provide a full body view of the inmate during the search. If an inmate was strip searched in his own cell he could easily drop contraband without staff detection and pick it up at the conclusion of the search.

On the day of the search, the Segregation Captain determined that the strip searches would be conducted in the strip cell and the twelve outdoor recreation cells. Defendants VanLanen, Mejia, Ehlers, Schultz, and Stevens were not involved in the decision to conduct strip searches in the outdoor recreation cells on July 17, 2013. As subordinate

officers, they did not have the authority to override the directives from the Segregation Captain on where the strip searches were to occur.

The recreation cells are in an outdoor area connected to the segregation building. There are twelve recreation cells that are divided into two rows of six cells. The roof and front of each cell is chain-linked fence. This allows light and fresh air into the cell. The remaining walls, including the side and the back walls, are concrete. The chain link cell fronts of the two rows of cells face in opposite directions. As a result of the concrete walls and opposite facing cell fronts, inmates cannot see into any of the other recreation cells from the inside of the cell. Recreation cells are regularly swept clean and are power washed if needed. Prior to using the recreation cells for strip searches, staff inspected them to ensure that they were clean and no contraband was present.

The procedure for searching the inmates' cells and strip searching each inmate was as follows. Two officers escorted the inmate from his cell to either the outdoor recreation area or the strip cell. Once the inmate arrived at his destination, he was handed off to a different strike team that conducted the strip search. After the strip search was concluded, the inmate remained in the area where the strip search occurred until a search of his cell was completed.

Inmates in segregation are in full restraints while they are out of their cell so two officers are present for every escort. Inmates are required to face forward at all times during an escort for security reasons. A thorough search was conducted of each inmate's cell

9

which included scanning the inmate's mattress and pillow with a metal detector. Staff also checked each cell for any needed repairs.

Inmates were in the recreation cells anywhere from ten to thirty minutes depending on the length of time it took to search their cell. Once the cell search was complete, the inmate was escorted back to his cell. As soon as an inmate was escorted back, freeing up a recreation cell or the strip cell, a new inmate was brought out to fill that cell and continue the process. From the time an inmate left an outdoor recreation cell or the strip cell it took approximately three to five minutes to get another inmate in that cell to conduct another strip search. Because inmates were being brought out to the outdoor recreation cells as they became open, it is possible that an inmate was inadvertently escorted past other inmates being strip searched. However, based on the logistics of the unit-wide search, it is unlikely that this occurred frequently or that an inmate would have gotten a good view of another inmate's naked body.

The unit-wide search of the segregation unit began on first shift, at approximately 7:30 am. The searches continued on through second shift and into the third shift which starts at 10:00 pm. During the unit-wide search, every cell in the segregation unit was searched and every inmate on the unit was strip searched. Numerous contraband items were found during the unit wide search including contraband prescription medications. A unit wide search typically results in numerous penological benefits including reducing the amount of contraband, discouraging inmates from accumulating contraband in the future, and

identifying needed repairs to the building. Additionally, Security Director Ericksen has noticed that after a shakedown the climate of the unit often settles down for awhile, meaning there are fewer incidents with the inmates.

**Strip Search of Strickland on July 17, 2013**

Strickland does not remember what time officers came to his cell to take him to be strip searched on July 17, 2013, but believes that it was sometime between 10:30 am and 3:30 pm. Strickland believes he walked past two or three outdoor recreation cells while being escorted outside to be strip searched. He believes he was placed in the third cell out of a row of six. The only staff members present when Strickland was strip searched on July 17, 2013 were two unidentified male officers. The unidentified male officers conducted a standard strip search of Strickland. Strickland did not say anything to the unidentified officers during the strip search and he does not remember the unidentified officers saying anything to him. Strickland estimates that the strip search took two or three minutes.

After Strickland's strip search was completed, staff gave him back his clothes, he waited in the recreation cell for a few minutes, and then he was returned to his original cell. Strickland estimates that he spent about fifteen minutes in the outdoor recreation cell.

Lt. Van Lanen was not present when Strickland was strip searched on July 17, 2013. Sgt. Stevens was not present when Strickland was strip searched on July 17, 2013. Officer Ehlers was not present when Strickland was strip searched on July 17, 2013. Officer Mejia was not present when Strickland was strip searched on July 17, 2013. Officer Schultz

11

was not present when Strickland was strip searched on July 17, 2013.

**<u>Strickland's Religious practices</u>**

Strickland describes himself as a practicing Muslim. He converted from Baptist to Islam around 2007. Strickland's practice of Islam consists of praying and reading the Koran. He does not regularly attend chapel services at the institution or participate in Ramadan fasting. Strickland does not yet have a full understanding of the religion of Islam. He does not fully understand the Islamic practice of modesty. However, Strickland indicates that he struggles with adhering to Islamic modesty principals.

**ANALYSIS**

Upon screening the complaint, the Court determined that Strickland could proceed on a Fourth Amendment privacy claim based on allegations that two females officers conducted the strip search as other staff and inmates walked by. The Court also identified a First Amendment free exercise claim based on Strickland's allegations that as a practicing Muslim it was impermissible for him to expose his body. (Screening Order, ECF No. 8, at 3-4.)

In support of their motion for summary judgment, the defendants contend that the Court should dismiss this lawsuit because, (1) they were not personally involved in the strip search of Strickland; (2) the strip search did not violate the Eighth Amendment[2]; (3) the

---

[2] The defendants contend that the strip search claim should be addressed under the Eighth Amendment instead of the Fourth Amendment. (ECF No. 21 at 12) (citing *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998)).

12

strip search did not violate Strickland's First Amendment free exercise rights; and (4) they have qualified immunity.

Strickland contends that there are genuine issues of material fact the preclude summary judgment for the defendants. According to Strickland, it has yet to be determined whether GBCI staff were trained on how to conduct strip searches properly and it is also yet unclear whether a lack of training caused prison staff to violate prison rules, regulations, and procedures that are in place to ensure that prisoners' constitutional rights are not violated. He also asserts that it has yet to be determined who made the decision to have the strip search conducted in the recreation cell in violation of the policy of conducting strip searches in Cell 621, and that whoever made the decision to conduct the strip search in the recreation cell placed Strickland in the position of having his constitutional rights violated by choosing not to use the designated strip search cell and having the search conducted by staff that lacked adequate training on the appropriate rules, policies, and procedures for strip searches of inmates. Strickland contends that given these issues, the defendants have not met their burden to show that there is no question of material fact. He does not dispute the defendants' contention that they were not personally involved in the search and he does not address the defendants' argument regarding the First Amendment free exercise claim.

Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009); *see George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). Only a defendant who is personally responsible

13

for depriving the plaintiff of a constitutional right may be held liable under § 1983. *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008). If someone else has committed the act that resulted in the constitutional deprivation, then the defendant is personally responsible, and thus liable under § 1983, only if he knows about the other person's act, has a realistic opportunity to prevent it, but deliberately or recklessly fails to do so. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009).

In this case, it is undisputed that the defendants had no personal involvement in Strickland's strip search. His claim is subject to dismissal on that basis. The defendants' contention that a lack of proper training may be at issue is misplaced because Strickland is not proceeding on a failure to train claim.

Even if the defendants were personally involved in the searches, the strip search claim and any privacy claim would still be subject to dismissal. A strip search violates the Eighth Amendment if it is "conducted in a harassing manner intended to humiliate and cause psychological pain." *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009); *see Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). A factfinder can reasonably infer an intent to harass when prison officials give no valid reason for a group strip search and guards demean prisoners during the search. *See Mays*, 575 F.3d at 650; *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002) (upholding denial of summary judgment when no justification was given for group strip search). In addition, sexual ridicule and female spectators during a strip search can

14

reasonably lead to the conclusion that the search was intended to humiliate. *See Calhoun*, 319 F.3d at 940.

Here, the undisputed facts establish that a unit wide strip search was conducted on July 17, 2013. The Segregation Captain decided to use the twelve recreation cells and one strip cell for the strip searches based on the number of inmates to be searched (141), because the cells provide a full view of the inmate which is necessary to conduct a proper search, and because the four observation cells were occupied. Although the recreation cells were mostly private because they have three brick walls, the cells did not provide full privacy in that it was possible that inmates or guards walking by the front of the cell to see the search. There is no indication that the plaintiff's strip search was conducted in a harassing manner to humiliate him or cause psychological pain. The plaintiff's search was short – only two to three minutes – and, as set forth in detail herein, it was justified by security reasons. Under these circumstances, a reasonable factfinder could not conclude that the plaintiff's constitutional rights were violated. *See Canedy v. Boardman*, 16 F.3d 183, 185-87 (7th Cir. 1944); *Mays*, 575 F.3d at 649-50.

Finally, to the extent that Strickland claims that the search violated his First Amendment right to religious freedom, that claim also fails because Strickland did not address it in his summary judgment response brief. He has therefore abandoned the claim. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003).

**ORDER**

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket # 20) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing this action.

Dated at Milwaukee, Wisconsin, this 3rd day of March, 2015.

                                                 **SO ORDERED,**

                                                 */s/ Rudolph T. Randa*

                                               **HON. RUDOLPH T. RANDA**
                                               **U. S. District Judge**